# EXHIBIT A

STITT VU
TRIAL LAWYERS

October 5, 2026

**VIA EMAIL**

Gabriel A. Peraza and Frank Blechschmidt
Assistant United States Attorneys
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701-5040
[redacted]

**Re: Annette Mattia, et al. v. United States of America, et al.**
**Case No. 4:24-cv-00252-RM (D. Ariz.)**
**September 17, 2026 Discovery Responses - Meet and Confer**

Dear Mr. Peraza and Mr. Blechschmidt:

I write regarding the United States' September 17, 2026 discovery responses. This letter seeks verification of all interrogatory answers and supplementation of Interrogatories Nos. 7-9, Requests for Production Nos. 2, 4, 15, 16, and 21, and Requests for Admission Nos. 8, 9, 10, 12, and 13. Page references below are to the September 17 responses unless otherwise specified.

Additionally, I would like to highlight how many extensions Plaintiffs afforded the United States to prepare these discovery answers. Plaintiffs served the discovery on the United States on May 15, 2026, and the United States requested four months of extensions to provide these responses. In particular, when we discussed a multi-month extension, Mr. Peraza cited the need for the lengthy extension to provide complete and fulsome answers. Mr. Peraza further agreed to notify me in advance of the lengthy extension if any legal objections would apply to the responses such that Plaintiffs could initiate a discovery dispute in court without incurring even more delay. No advance notice was provided by Mr. Peraza, and given the length of extensions already afforded the United States, Plaintiffs expect that the United States will respond expeditiously to this letter.

## I. INTERROGATORIES

### Verification of all nine answers

None of the interrogatory answers is verified. Counsel's signature on page 48 does not constitute the required verification of the factual answers. Please serve a verification covering all nine answers and any supplemental answers, signed under oath by an authorized officer or agent answering for the United States. A signed declaration complying with 28 U.S.C. § 1746 is acceptable. The answers must furnish the information available to the United States, not merely the signer's personal recollection. Fed. R. Civ. P. 33(b)(1)(B), (3), (5).

### No. 7 - Identify the persons who gave the commands (pp. 22-31)

The request expressly asks for each command's words, speaker, and approximate time. The response supplies counsel's descriptions and timestamps but not the speakers. Footnote 1 defers identifying the speakers, and commands recalled but not audible on the recording, to future discovery. Please inquire of the relevant participants and supplement the answer with the missing

Ryan W. Stitt, Partner
Tommy H. Vu, Partner
501 W Broadway, Suite 730
San Diego, CA 92101
Office Number: (619) 255-0553

identities and any additional commands reasonably ascertainable. Identify any uncertainty that remains after that inquiry rather than deferring the entire issue to depositions.

The inquiry concerns participants in this incident, not every federal employee. Rule 33(d) permits reliance on specified business records only when the answer can be derived from them and the burden is substantially the same for either party. Producing recordings does not supply missing speaker identifications or establish that Plaintiffs are equally able to recognize the agents' voices. Please provide the substantive information or explain, with particular record references, how Rule 33(d) supplies it.

**No. 8 - Policy violations, discipline, and corrective action (pp. 31-32)**

The response objects to relevance and states there is no responsive information. Please clarify that the inquiry covered all responding agents and each requested category: a policy-violation determination, discipline, and corrective action. Corrective action may include incident-related counseling or retraining without formal discipline.

After inquiry of responsible supervisory, investigative, personnel, and training officials, identify each responsive agent and category. If none qualifies, affirmatively verify that answer. Distinguish pending reviews from completed determinations. Findings and corrective action concerning this shooting bear on the conduct and defenses at issue; a policy violation need not itself establish liability to warrant discovery.

**No. 9 - Offenses actually suspected when agents responded (pp. 32-33)**

The response recites statutory powers and possible firearm offenses and explains that the dispatch report did not establish citizenship or firearm eligibility. It does not identify the offenses agents actually suspected Mr. Mattia of committing. Possible offenses that unknown circumstances might implicate do not answer that question.

Please identify each agent's actual suspected offenses and the conduct believed to constitute them, based on information available when responding to the home. Agents sharing the same information and suspicion may be grouped. If no particular offense was suspected, say so. Distinguish those suspicions from observations made later; statutory authority is not a substitute for this factual answer.

**II. REQUESTS FOR PRODUCTION**

Please identify any withheld responsive material and search or production limitations. Fed. R. Civ. P. 34(b)(2)(B)-(C). Support privilege claims under Rule 26(b)(5)(A). Identify previously produced responsive materials sufficiently to resolve these disputes; duplicates are unnecessary.

**No. 2 - Complaints concerning force, dishonesty, and documentation (pp. 33-34)**

The response identifies body-force complaints against Torralva from an April 2023 immigration arrest and Sifuentes from an April 2013 immigration arrest, but withholds both files because management found the allegations unsupported and considers the incidents unrelated. Please produce the complaints, agent and witness statements, investigative materials, findings, and

dispositions for those identified matters. Also confirm that the search covered complaints of dishonesty and failures to record or document enforcement actions, not only excessive force.

An unsustained disposition does not itself make the underlying file undiscoverable. These records may bear on force assessments, reporting accuracy, corrective instruction, or credibility, not merely propensity. *See Kerr v. United States District Court for the Northern District of California*, 511 F.2d 192, 196, 198 (9th Cir. 1975), *aff'd*, 426 U.S. 394 (1976); *Soto v. City of Concord*, 162 F.R.D. 603, 620-21 (N.D. Cal. 1995) (citizen-complaint discovery). Specific burden or confidentiality concerns can be addressed through targeted limits, protective terms, and redactions, rather than categorical withholding.

**No. 4 - Prior firearm discharges, including Sifuentes in March 2021 (pp. 35-36)**

The response identifies Sifuentes' March 2021 service-firearm discharge during an incident involving an alleged attempted carjacking of a Border Patrol vehicle, but withholds the records as irrelevant and notes that the suspect was not struck. Please produce the incident reports, agent and witness accounts, available recordings, investigative findings, disposition, and any incident-related corrective-action records. The absence of injury does not eliminate questions concerning the perceived threat, decision to fire, accuracy of the agent's account, or resulting instruction.

At a minimum, this dispute concerns the identified on-duty service-firearm discharge, which falls within even your stated interpretation of the request. Please produce those records and identify any specific objection to a particular category. We can separately discuss appropriate limits concerning other discharges; the request's reference to three agents does not itself justify withholding this identified file.

**No. 15 - Disciplinary history, not only discipline from this shooting (p. 43)**

No. 15 requests disciplinary records during the three agents' Border Patrol employment. The response answers only whether they were disciplined for the Mattia incident, effectively repeating the answer to No. 14. Please address the requested employment history. To resolve the subject-matter breadth objection, Plaintiffs will accept records concerning force, firearms, dishonesty or lack of candor, and failures to preserve, record, or accurately document enforcement actions or evidence; unrelated attendance, payroll, and similar matters may be excluded. Identify any remaining temporal objection specifically rather than limiting the answer to this incident. If no records exist within that scope after a reasonable search, confirm that expressly.

**No. 16 - Communications and the defined scope of "YOUR" (pp. 43-44)**

The request must be read with the served definitions. Definition 2 on page 2 of the requests provides: **"YOU" or "YOUR" means Defendants Whitehouse, Sifuentes, Torralva, their attorneys, any employees of their attorneys, and any PERSONS acting on behalf of Defendant United States of America.** Definition 3 includes a "natural person," "employee," and "government agency" within "PERSON" or "PERSONS." Instructions 4 and 5 further address responsive documents held by representatives or agents, without regard to physical location.

Definition 1 also defines "COMPLAINT" by the facts and allegations, not merely the pleading itself. Plaintiffs seek communications about the shooting and its investigation, including

communications among the named Defendants and communications between any of them and other persons acting on behalf of the United States. If you interpret the phrase "between Defendants Whitehouse, Sifuentes and Torralva" as excluding that latter category notwithstanding the definitions, please identify that scope disagreement so we can resolve it. In the meantime, produce the undisputed communications.

The response's restriction to records held by CBP leaves unanswered whether relevant emails, texts, or other messages were sought from the individual agents and other relevant federal custodians. Please conduct a reasonable search of relevant government email, government-issued phones, retained messaging data, and responsive investigative records, including OPR and FBI records to the extent within the United States' possession, custody, or control. Identify the custodians, source categories, and date ranges searched, and explain any excluded source. Confirm preservation of potentially responsive communications pending resolution.

The responding party is the United States, not CBP alone. Rule 34(a)(1) reaches the party's possession, custody, or control; an assertion that material is outside CBP's file does not resolve control. The Ninth Circuit's control standard concerns the legal right to obtain documents on demand. *In re Citric Acid Litigation*, 191 F.3d 1090, 1107-08 (9th Cir. 1999). We do not demand unrestricted access to private devices or assume control over every federal record. Please identify any particular lack-of-control basis and the known custodian. Privileged legal communications may be withheld on a properly supported basis, not simply because an attorney or another agency holds the record.

**No. 21 - Written authority relied upon by the United States (p. 46)**

This request is limited to written agreements, reports, or memoranda with the Tohono O'odham Nation that the United States claims justify its agreement to assist TOPD in responding to Mr. Mattia's home. Such documents directly concern the asserted justification for that assistance. The response says only that CBP does not have responsive written documents; it does not say whether the United States relies on such an instrument held by another relevant federal custodian.

Please respond on behalf of the United States after reasonable inquiry and produce responsive documents within its possession, custody, or control. If the United States relies on no responsive written instrument, say so expressly. If a responsive document exists but you claim it is outside the United States' control, identify the known custodian and explain that position. Plaintiffs do not assume an agreement exists, and are not requesting every federal agreement with the Nation; a CBP-only response nevertheless fails to resolve the actual request.

**III. REQUESTS FOR ADMISSION**

Rule 36(a)(4) requires an answer fairly addressing the substance of the request, with appropriate partial admissions and qualifications. An inability to answer requires reasonable inquiry and a statement that information known or readily obtainable remains insufficient. See *Asea, Inc. v. Southern Pacific Transportation Co.*, 669 F.2d 1242, 1246-47 (9th Cir. 1981). These requests address this incident and the United States' conduct through its agents; they do not assert that every

federal employee performed every act. Admissions of historical facts need not concede that the force was unlawful.

**No. 8 - Command to remove a hand from the pocket (p. 11)**

The response disputes the precise words "remove" and "jacket pocket." Yet the answer to Interrogatory No. 7 identifies "put your hands out of your fucking pocket" at approximately 39:27-39:28 and "hands out of your pocket" at approximately 39:28-39:29, citing USA-000016 (pp. 25, 27). Please reconcile the answers and address whether Mr. Mattia was ordered to take his hand or hands out of his pocket before the shooting. State separately any genuine qualification concerning the speaker, whether the speaker acted for the United States, or the type of pocket. The request does not require the command to use the literal verb "remove."

**No. 9 - Whether Border Patrol gunfire caused Mr. Mattia's death (pp. 11-12)**

The response admits the three agents fired, that at least one Border Patrol agent shot Mr. Mattia, and that he died afterward, but does not answer causation. The request asks whether the United States, through its agents, shot and killed him; it does not require attribution of a fatal round to a particular shooter. Please answer the collective causation question after inquiry into reasonably available medical and investigative evidence. If the information remains insufficient, provide the explanation required by Rule 36(a)(4), distinguishing an inability to identify the fatal shooter from an inability to determine whether the agents' gunfire caused death.

**No. 10 - Actual possession of a weapon, not perceived possession (pp. 12-13)**

The response substitutes the agents' perceptions and the presence of an object in Mr. Mattia's hand for whether he was actually armed. To resolve the stated ambiguity, "unarmed" concerns actual possession of a weapon at the time of the shooting, not an agent's belief that an object was a firearm. Please admit or deny that factual proposition, with any appropriate qualification. If you contend the object itself constituted a weapon, state that qualification; the mere presence of an object does not answer the request. An admission may expressly preserve the defense that an agent reasonably perceived a firearm.

**No. 12 - Whether a firearm was on his person when he was shot (pp. 13-14)**

The response admits only that no firearm was found on his person afterward. Please answer whether he actually had a firearm on his person when shot, after reasonable inquiry into the available evidence. The request does not ask what the agents believed or whether a firearm was elsewhere in the home. If the United States cannot answer the requested fact, explain that inability under Rule 36(a)(4), rather than substituting the result of the later search.


Ryan W. Stitt, Partner
Tommy H. Vu, Partner
501 W Broadway, Suite 730
San Diego, CA 92101
Office Number: (619) 255-0553

**No. 13 - Compliance with the command concerning the knife/machete (p. 14)**

The response focuses on whether the exact words "drop the knife" were spoken and whether every agent perceived a knife or saw Mr. Mattia exit. Interrogatory No. 7 instead identifies commands to "put that down for me" and "put it down, put it down" (p. 24). The answer to RFA No. 14 also acknowledges that he threw an object later confirmed to be a machete, that it did not appear within his reach afterward, and that the agents did not immediately fire in response to the throw (p. 15).

Please answer whether Mr. Mattia complied with the command concerning that object, admitting the portions that are true and separately identifying any qualification. If your position is that throwing the machete did not constitute compliance because of the manner or direction of the throw, state that position directly. Plaintiffs seek an answer to the substance, not abandonment of a genuinely disputed compliance issue or agreement that every agent saw the same events.

**IV. PROPOSED RESOLUTION**

Please provide your written position and availability for a telephone conference by October 15, 2026. Plaintiffs propose completing verification and agreed supplementation and production by October 22, 2026. Identify any item requiring additional time and propose a specific schedule, with rolling production of undisputed material.

This letter initiates, but does not replace, the personal consultation required by Rule 37(a)(1) and LRCiv 7.2(j). If disputes remain, Plaintiffs will seek appropriate relief under Rules 36(a)(6) and 37 through the procedures required by the Court's operative orders. These proposed dates do not extend any court deadline. Plaintiffs reserve their position on requests not addressed here.

Respectfully,

Ryan W. Stitt

Ryan W. Stitt
Stitt Vu Trial Lawyers APC
Attorneys for Plaintiffs

cc: All counsel of record (via email)



Ryan W. Stitt, Partner
Tommy H. Vu, Partner
501 W Broadway, Suite 730
San Diego, CA 92101
Office Number: (619) 255-0553

# EXHIBIT B

**"for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony." Unlawful acts under the laws of the United States involving the possession of a firearm can include, without limitation, those enumerated by Congress in 18 U.S.C. § 922, including, without limitation, subpart (g).**

**The incident occurred approximately .06 miles north of the U.S.-Mexico border. The report by TOPD dispatch to USBP Tucson Sector dispatch concerning shots fired in the Menagers Dam Village on May 18, 2023, does not indicate that the report involves a "domestic disturbance" between citizens of the United States or that the shots were fired by a citizen of the United States. The report by TOPD dispatch to USBP Tucson Sector dispatch does not make clear whether the shots were fired by an alien, lawful permanent resident, or United States citizen, or whether the person who had fired the shots was lawfully permitted to possess a firearm or in violation 18 U.S.C. § 922, including, without limitation, subpart (g). Simply put, TOPD reported shots fired within USBP's patrol area and requested assistance in responding.**

<u>Interrogatory No. 7</u>: Describe each command given to Raymond Mattia during the incident, including the exact words used, the person who gave the command, and the approximate time the command was given.

**ANSWER: The United States objects to this discovery request on the grounds that: (1) the request is overly broad because the instructions to Plaintiffs' discovery purport to require the United States to respond on behalf of every responding Border Patrol agent present during the incident; (2) the request constitutes a compound question (and separate interrogatory) to the extent that it requires an answer from each responding Border Patrol agent, and the answers by each responding Border Patrol Agent may differ; (3) it would be unduly burdensome to require the United States to respond on behalf of all responding Border Patrol agents; and (4) the burden**

**of deriving or ascertaining the answer from each responding Border Patrol agent will be substantially the same for either party.**

**Subject to and without waiving the foregoing objections, the United States refers Plaintiffs to the body-worn camera (BWC) footage produced with the United States' First Supplemental Disclosure Statement bates labeled as USA-000001–16 and the recorded interviews by the FBI and OPR that are referenced in response to Interrogatory No. 3. *Undersigned counsel* notes that the following commands can be heard prior to the shooting in the audio that is contained in the BWC footage produced with the United States' First Supplemental Disclosure Statement, with still images from USA-000016 and USA-000020 provided below for context:[1]**

- **At approximately 38:53-39:00, the command "Police . . . come here Raymond, hands up" appears to have been given to Mr. Mattia. *See* USA-000016.**
  - **Based on the video footage produced, it does not appear that Mr. Mattia complied with this (first) command to put his "hands up."**
- **At approximately 39:12-39:16, the command "come out, hands up, Officer Randle, TOPD" appears to have been given to Mr. Mattia. *See* USA-000016.**
  - **Based on the video footage produced, it does not appear that Mr. Mattia complied with this (second) command to put his "hands up." In fact, Mr. Mattia was standing behind a wall/partition as law enforcement approached, entered a part of his home, and then reappeared standing behind the wall/partition. *See* USA-000021 at 6:09–6:33. A rifle was later found where Mr. Mattia had entered his home. *See* USA-000007 and USA-000010.**
- **At approximately 39:19, the command "come out" appears to have been given to Mr. Mattia. *See* USA-000016.**

---

**[1] The timestamps provided in response to this interrogatory are based on the time shown in the BWC footage referenced (USA-000016). Additional discovery in this matter will be necessary to potentially identify the source of each command identified, and whether any Border Patrol agent recalls hearing or giving a command that cannot be heard on the BWC footage referenced.**

- **At approximately 39:21-39:22, the command "put your hands up" appears to have been given to Mr. Mattia.** ***See*** **USA-000016.**
    - **Based on the video footage produced, it appears that Mr. Mattia did not comply with this (third) command to put his "hands up."**
- **At approximately 39:22-39:23, the command "put that down for me" appears to have been given to Mr. Mattia.** ***See*** **USA-000016.**
    - **Based on the video footage produced, it appears that Mr. Mattia did not comply with this (first) command to put the object down.**
- **At approximately 39:22-39:24, the commands "put it down, put it down" appear to have been given to Mr. Mattia.** ***See*** **USA-000016.**
    - **Based on the video footage produced, it appears that Mr. Mattia did not comply with these (second and third) commands to put the object down and, instead, proceeded to throw the object (a machete) with his right arm in the direction of law enforcement.** ***See*** **the still images from USA-000020 below.**





- **At approximately 39:25-39:26, after Mr. Mattia had thrown the object towards law enforcement, the command "get on your fucking face" appears to have been given to him. *See* USA-000016.**
  - **Based on the video footage produced, it appears that Mr. Mattia did not comply with this command and, instead, proceeded to reach into his pocket with his right hand and reach across his body with his left hand.**
- **At approximately 39:27-39:28, after Mr. Mattia had failed to put his hands up and, instead, reached into his pocket, the command "put your hands out of your fucking pocket" appears to have been given to him. *See* the still images from USA-000016 below.**


2023-05-19 00:39:28 -0400
AXON BODY 3 X60A34400








- **At approximately 39:28-39:29, the command "hands out of your pocket" appears to have been given to Mr. Mattia. *See* USA-000016.**
- **At approximately 39:29-39:30, the command "get on your fucking face"**

**appears to have been given to Mr. Mattia. *See* USA-000016.**

- **Based on the video footage produced, it appears that Mr. Mattia removed an object from his pocket with his right hand and then extended his right arm forward towards agents. *See* the still images from USA-000016 below.**







2023-05-19 00:39:29 -0400
AXON BODY 3 X60A34400




2023-05-19 00:39:29 -0400
AXON BODY 3 X60A34400








Interrogatory No. 8: Identify all Border Patrol agents who were involved in the response to Raymond Mattia's home on May 18, 2023, and were later determined to have violated Border Patrol Policy, were disciplined, or received corrective action all in relation